**WRIGHT v. MATTHEWS et al.**

No. 10866.

Court of Civil Appeals of Texas.
San Antonio.

Oct. 9, 1940.

Rehearing Denied Nov. 6, 1940.

McCombs & Andress, of Dallas, for appellant.

Spears, Conger, Baskin & Spears, of San Antonio, for appellees.

MURRAY, Justice.

This is the second appeal of this case. Our opinion on the first appeal is to be found in 130 S.W.2d 413.

This suit was instituted by Frank W. Matthews, guardian of Genoa C. McGinley, non compos mentis, against Kathryn Hughes and her husband, Foy T. Hughes, Benjamin F. Wright, and John P. Forrest, seeking to set aside a deed purportedly executed by Genoa C. McGinley to Kathryn Hughes, conveying Lot 14, Block 66, New City Block 3334, of the City of San Antonio, dated July 10, 1937, and further seeking to cancel a deed of trust lien securing a note in the principal sum of $4,250 held by Benjamin F. Wright, and a second deed of trust lien, securing the payment of a note in the principal sum of $475, held by John P. Forrest. Mrs. McGinley had been adjudged insane after she had signed the deed to Kathryn Hughes.

The cause was submitted to a jury upon the following sole issue: "Do you find from a preponderance of the evidence, if any, that at the time Genoa C. McGinley executed the deed dated July 10, 1937, to Kathryn Hughes, wife of Foy T. Hughes covering the property involved in this suit that the said Genoa C. McGinley did not have sufficient mental capacity to execute said deed?"

The jury answered this issue that Genoa C. McGinley did not have sufficient mental capacity to execute said deed. Based upon this verdict and other findings made by the trial court, judgment was rendered as follows:

"(1) Cancelling, setting aside and holding for naught the deed dated July 10, 1937, from Genoa C. McGinley to Kathryn Hughes.

"(2) Cancelling, setting aside and holding for naught the deed of trust executed on July 22, 1937, by Kathryn Hughes and husband to Nowlin Randolph, as trustee for the said Benjamin F. Wright.

"(3) Cancelling, setting aside and holding for naught the deed of trust executed on August 18, 1937, by Kathryn Hughes and Foy T. Hughes, conveying said Lot 14 to John P. Forrest, to secure a note in the sum of $975, insofar as the same affects the rights of Genoa C. McGinley.

Also canceling power of attorney executed by Kathryn and Foy T. Hughes to John P. Forrest.

"(4) The judgment based upon the condition that Frank W. Matthews, as guardian, pay into the registry of the court the sum of $232, to reimburse Kathryn and Foy T. Hughes for taxes paid by them, and the sum of $175 to reimburse the Hughes for the consideration paid.

"(5) Granting personal judgment in favor of Benjamin F. Wright against Kathryn and Foy T. Hughes for the amount of principal and interest due on the Wright note, but allowing no foreclosure.

"(6) Discharging C. N. Wideman as receiver of the property."

From this judgment Benjamin F. Wright alone has prosecuted this appeal.

Appellant contends by his first three propositions that the answer of the jury should be set aside because:

First: There is no evidence to support it.

Second: There is insufficient evidence to support it.

Third: That it is so contrary to the overwhelming preponderance of the evidence as to demonstrate that it is clearly wrong.

The deed was dated July 10, 1937, and acknowledged on July 12, 1937, by Genoa C. McGinley. The jury's answer to the only special issue submitted to them found that Genoa C. McGinley at the time she executed the deed to Kathryn Hughes did not have sufficient mental capacity to execute said deed.

We are of the opinion that the evidence is sufficient to support this finding. The appellees placed four witnesses on the stand who testified concerning the sanity of Genoa C. McGinley. The first witness to testify on this subject was Viola Strickland. She testified that she became acquainted with Genoa C. McGinley in about 1935, and that she had known her for about two years prior to the time the deed was signed. She worked in Fottrell's beer place and it was there she got acquainted with Catherine (Genoa C. McGinley). Catherine came to Fottrell's place quite often. Fottrell had a tourist camp in conjunction with his beer business and ultimately Catherine moved over to the tourist camp and lived in the same house with the witness. The witness lived in the same

house, or at least in the same tourist camp, with Catherine for about one and one-half years and saw her every day. Catherine drank beer and liquor and this drinking habit increased from time to time. She had known Catherine to buy two or three pints of liquor in one day. She noticed peculiar conduct by Catherine for about a month before the signing of the deed. In this connection she testified as follows: "Q. Well, now, what, if anything, unusual in her conduct did you notice at that time? A. Well, during the last three weeks I knew Catherine, one time she disappeared, and was gone about three days; and when she came back, I was on duty, it was in the night sometime, the evening was quiet, and she came in the door, and she looked very unsteady and I thought she was intoxicated; and she came in and said, 'Somebody stole my check,' and started to talk to all the customers. It was my duty to quiet her if I could, but I couldn't, and I called Mr. Fottrell and told him Catherine was sick; and she went home, but instead of going home, she went over to another cabin, where she lived previously, and she was crying by herself, and went over to the other side of town—
* * *

"Well, she stayed in bed two or three days, wouldn't eat, wouldn't get up to eat, wouldn't dress; we were bringing her food over to her; and finally I taken her back over to our cabin, where the girls lived. And it seemed her husband had been killed, or something, and she had a flag, and she got the flag out, and all her papers, and she would sit for days and rock and talk and talk about her husband; and one time she wanted to go about half a block over to the bar place to get a drink, and she got lost on the way over, didn't remember anything; and I taken her one day into the cafe to eat, and I couldn't do anything with her in there, nobody could do anything with her, and I took her back home, and she told me to call up her mother, but I never; she just sat and rocked, very different from the way she had acted; and she wasn't drinking at that time, the last three weeks I saw Catherine she wouldn't drink anything."

The next witness was A. J. Fottrell. He testified that he had known Genoa C. (Catherine) McGinley for about two years before July 10, 1937. She used to buy drinks at his place of business which was located at 219 Hot Wells Boulevard. He described his business as follows: "I had a restaurant and bar joined, and tourist camp." She finally came and rented a cabin from him. For about eight months she was at his place of business every day. Prior to the time she moved to his place she would come here in a taxicab and stay two or three hours, drinking several bottles of beer, during which time she would keep the taxicab waiting for her. She drank a great deal during the time he knew her. With reference to her unusual conduct he testified, as follows:

"Q. Now, Mr. Fottrell, during the time you knew Mrs. McGinley, I will ask you to state whether or not you noticed anything unusual in her conduct? A. Towards the last I did, quite a bit.

"Q. Now, how do you mean 'towards the last,'—over about what period of time? A. Well, at times she would be talking about sleeping with a dead man, stuff like that; of course, she would have spells of that kind, and we would have to sort of quiet her down, you know, and she would be all right for a while.

"Q. Now, approximately, how long before July 10, 1937, was it that you first noticed those spells? A. Well, I guess about a month.

"Q. About a month? A. Yes, sir.

"Q. Now, just what would she do and what would be her appearance when talking about sleeping with dead men? A. Well, she would cry and talk about sleeping with dead people; and she one day came up to the place and wanted to take some soda water back with her, and couldn't find her way back.

"Q. She couldn't find her way back? A. No, sir, she didn't know where she lived, didn't know where her cabin was she lived in, didn't know which way to go. So I called Dr. Goodson then to come out to see her. Dr. Goodson came out,—
* * *

"So I called Dr. Goodson—I think it was Dr. Goodson—I called him over the phone and had him come out. Well, the cabin was in the back area at the time; when we got out there, we seen she was gone; I went over there to the house, and they said she didn't want to—she was gone—* * *

"Q. Now, did you notice anything else unusual in her conduct besides this conduct that you have just spoken about, when she was talking about sleeping with dead

men? A. Well, that is all, I didn't ask, try to find out.

"Q. Did you ever notice her crying, anything like that? A. Oh, she cried there.

"Q. Wring her hands? A. Oh, yes.

"Q. How often would that be? A. Well, that was towards the last I am speaking of—about a month before.

"Q. Would she say anything while crying and wringing her hands? A. Well, she would talk about dead people, people burning up, and things of that kind, and sleeping with them.

"Q. Now, Mr. Fottrell, did you ever have any conversation with Mrs. McGinley relative to any property that she had? A. Oh, yes—yes, sir. She wanted to give it to me.

"Q. Now, just state what the nature of the conversation and those transactions were? A. Well, she wanted to give me this property, and I told her, I said, 'No, don't do that, I can't do that, I have got a family, and I don't want to mess my family up.'

"Q. Now, what property did she have reference to? A. A place over on McKinley, a place—I don't know, I didn't pay any attention. And I said, 'The right thing to do is to go up there and see Mr. Riley Wyatt over at the Stewart Title Company, and deed it over to your mother, and that is the right thing to do.' She said all right. Well, after that I said we will go up the next morning; she said all right. The next morning I went over to get her to go, and she said, 'I don't feel like going,' and I went on about my business."

Estella Seibring testified to similar facts as those related by Viola Strickland and A. J. Fottrell.

Doctor T. E. Christian, Assistant County Health Officer of Bexar County, testified to facts showing himself to be well qualified as an expert to give an opinion as to the sanity or insanity of a person. He examined Genoa C. McGinley as to her sanity during the latter part of July, 1937, and several days after she had signed the deed in question. This examination covered a period of about ten days. He expressed the opinion that she was suffering from dementia praecox, a form of insanity, and had not had a lucid interval for more than twelve months prior to the time he examined her.

Hugh H. Batchelder, a witness for appellant, testified that he was a notary public in and for Bexar County and that he took the acknowledgment of Genoa C. McGinley to the deed in question. He also took an affidavit from her as to her marital relations. He had merely met her before the occasion on which she signed the deed. He explained both the deed and the affidavit to her at the time she signed them. This took something like twenty minutes. The instruments were signed in a car parked on the street near St. Mary's Catholic Church in the City of San Antonio. During his dealings with Genoa C. McGinley he noticed nothing unusual in her conduct.

Where an attack is made upon the answer of a jury, such as is here presented, the well-established rule is that the court is required, "to look most favorably upon the testimony tending to support the jury's findings, and under that test to uphold those findings if they appear to be founded upon material and substantial evidence; unless, indeed, the evidence to the contrary preponderates so overwhelmingly that no reasonable mind could disregard the one and give effect to the other, or reconcile the two so as to support the jury's findings." Moore v. Marines, Tex. Civ.App., 269 S.W. 825, 826.

When this rule is applied to the testimony above set forth, no other conclusion can be reached than that the answer of the jury was sufficiently supported by the evidence, and that it was not contrary to the overwhelming preponderance of the evidence so as to indicate that it was clearly wrong.

Appellant next contends that as mortgagee he was entitled to urge all defenses and to assert all rights that his mortgagor, Kathryn Hughes, could have asserted, and that he was not permitted to do this. Appellant requested that four special issues be submitted to the jury, which issues were by the court rejected. These issues inquired whether or not Kathryn Hughes acted (1) in good faith, (2) without fraud or imposition, (3) for a valuable consideration, (4) without notice of Mrs. McGinley's infirmity. Had these issues been submitted to the jury and answers favorable to appellant returned, they

would not have prevented the setting aside of the deed from Mrs. McGinley to Kathryn Hughes, but would have only required that Kathryn Hughes be first equitably restored to her original position. Art. 5561a, Vernon's Ann.Tex.Civ.Stats. This the judgment herein does, and therefore appellant is not in any position to complain as he is unable to show that he has been injured in any way.

Appellant's fifth, sixth and seventh propositions are overruled for the same reasons as his fourth.

Appellant's eighth, ninth and tenth propositions are without merit and are overruled. He does not show that he has been injured by any of the things complained of in these propositions.

Appellant's eleventh proposition is sustained and the amount of the judgment against Kathryn Hughes and Foy T. Hughes will be changed from the amount of $2,629.02 as of May 21, 1938, to the principal sum of $3,094.89, together with interest at the rate of 10%, from March 2, 1940, until paid.

Appellant contends by his twelfth proposition that the burden of proof was upon the guardian of Mrs. McGinley to offer evidence sufficient to show what the consideration of the deed was and to secure from the jury a finding to this effect before he would be entitled to a rescission of the deed. The deed recited a consideration of ten dollars and other valuable consideration. The judgment herein required Frank W. Matthews, guardian, to pay into the registry of the court for the use and benefit of Kathryn Hughes and Foy T. Hughes the sum of $245.45, and the further sum of $175. Appellant contends, however, that there is no evidence to show that these sums embrace all the consideration paid to Mrs. McGinley by Kathryn and Foy T. Hughes. If there was other consideration paid, Kathryn and Foy T. Hughes would be the proper parties to complain and not Benjamin F. Wright, the only appellant herein. This assignment will be overruled.

We overrule appellant's thirteenth proposition as he is not protected under the provisions of Art. 5561a, Vernon's Annotated Texas Civil Statutes, as held in our former opinion in this case, reported in 130 S.W.2d 413.

The judgment is affirmed.